1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JOHN COLLIER and KRYSTA RENFRO, individually, and on behalf of a class of similarly situated individuals,<br><br>         Plaintiffs,<br><br>     v.<br><br>FORD MOTOR COMPANY, a Delaware corporation,<br><br>         Defendant. | NO.  3:23-cv-5778<br><br>**COMPLAINT - CLASS ACTION**<br><br>**JURY DEMAND** |

### INTRODUCTION

1.      Plaintiffs John Collier and Krysta Renfro ("Plaintiffs") bring this Complaint individually and on behalf of all persons in the United States who purchased or leased any 2020 to present Ford Explorer vehicle equipped with a rear subframe assembly attached to the vehicle via only one rear axle horizontal mounting bolt ("Class Vehicles" or "Vehicles").

2.      Defendant Ford Motor Company ("Ford" or "Defendant") designed, manufactured, marketed, distributed, and warranted the Class Vehicles.

3.      This is a consumer class action concerning a failure to disclose material facts and a safety concern to consumers.

4.      Specifically, Ford designed and manufactured two different rear subframe

COMPLAINT - CLASS ACTION - 1

assemblies for the Explorer: one with two rear axle horizontal mounting bolts and one with only one bolt.   The one-bolt assembly found in Class Vehicles is defectively designed and manufactured because the single bolt can fail. The failure is due to the increased bending stress on that single bolt, which leads to the sudden and violent disconnection of the rear driveshaft assembly (or its component parts) (the "Mounting Bolt Defect" or the "Defect").

5.       Even before the bolt fails completely, it will show signs of stress and may deform, as will the bushings near the bolt.

6.       When the single rear subframe assembly bolt fails while a Class Vehicle is being driven, the rear differential and rear axle half-shafts can detach, damaging the vehicle's suspension, driveshaft assembly, or exhaust system. As a result, a driver will lose control of the Class Vehicle while driving, drastically increasing the risk of collision due to the driver's inability to maintain steering, braking, and speed control.

7.       The Mounting Bolt Defect presents a significant safety hazard. The Mounting Bolt Defect endangers drivers, pedestrians, and other vehicles because it makes accidents more likely, and sometimes entirely unavoidable. For this reason, Class Members have consistently reported fear of driving their Class Vehicles.

8.       Defendant sold the Class Vehicles with a 3-year/36,000-mile New Vehicle Limited Warranty ("NVLW") that purports to cover the rear subframe assemblies. However, owners and lessees complain that when their rear subframe assemblies require repair or replacement, they are refused a sufficient repair, even when within the warranty period.

9.       The Mounting Bolt Defect is inherent in each Class Vehicle and was present at the time of sale or lease.

10.      Defendant was aware in at least 2019, and likely several years prior, that the Class Vehicles required two rear axle mounting bolts, as evidenced by its presale design and testing of the newly re-designed 2020 Ford Explorer ST. Ford's specs—tested and designed by Ford itself—show that it understood that Explorers, especially on higher horsepower and torque-rated

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

vehicles and rear-wheel drive vehicles, require two rear axle mounting bolts. Ultimately, Ford implemented the two-bolt subframe in only a small subset of the 2020 Ford Explorer STs with higher horsepower and torque ratings, the rollout for which immediately preceded the Class Vehicles. Discovery will show that Ford willfully substituted the unsafe rear subframe assembly with one rear axle mounting bolt due to supply chain issues beginning in 2020 as a result of the Covid-19 pandemic but has not returned to use of two rear-axle mounting bolts as a cost-saving measure.

11.     Accordingly, discovery will show that, since the beginning of 2020, Defendant has known that the Class Vehicles' rear subframe assemblies were defective and would need frequent repair; that the Class Vehicles' rear subframe would prematurely fail; that the Class Vehicles' rear subframe would require frequent replacement, including replacements just outside of warranty; that the replacement rear subframe assemblies installed would be equally as defective as the originals; and that the rear subframe assemblies would cause the symptoms of the Mounting Bolt Defect described above. Yet, Defendant continued to equip the Class Vehicles with defective rear subframe assemblies.

12.     Defendant not only refused to disclose the Mounting Bolt Defect to consumers, Ford also actively concealed, and continues to conceal, its knowledge concerning the Mounting Bolt Defect and its associated safety risks.

13.     Defendant undertook affirmative measures to conceal rear subframe assembly failures and other malfunctions through, inter alia, Technical Service Bulletins ("TSBs"), which were issued to authorized repair facilities only and not provided to owners or lessees.

14.     On April 14, 2022, Ford issued a Safety Recall Report (Manufacturer Recall No. 22S27) recalling 2020–2022 Ford Explorer 2.3L RWD / 3.0L PHEV / 3.3 L FHEV Retail / 3.0L ST gas vehicles.[1] The Safety Recall Report ("Recall" or "2022 Recall") explained that the

---

[1] Recall No. 22S27 also included two types of Ford Explorer police vehicles that are not sold to the general public and are not a part of this Complaint.

COMPLAINT - CLASS ACTION - 3

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

affected vehicles are "equipped with suspect rear axle bolts and [sic] an older version of Electronic Park Brake Software."

15.     Ford observed in the recall notice "[o]n some units the rear axle horizontal mounting bolt may fracture. Powertrain torque through the driveline causes axle rotation of the pinion angled towards the subframe, which exerts a bending force on the rear axle bolt . . . The joint design is not robust to peak axle input torques and manufacturing variability. The primary contributor is insufficient bearing area for maximum joint loads. This results in bearing area deformation, increasing bending stress on the bolt, which may lead to a fatigue failure."

16.      Ford only partially explained the risk of the Mounting Bolt Defect: "If the rear axle bolt breaks, the driveshaft/half shafts may become disconnected, resulting in loss of transmission torque to the rear wheels which is necessary to hold the vehicle in park. If the parking brake is not applied, the loss of the primary park torque will allow the vehicle to roll in park increasing the risk of crash and injury."

17.     Ford ignored the other obvious possibility: that the driveshaft/half shafts may become disconnected while the car is moving.

18.     Ford's purported fix, however, was not to replace defective one-bolt assemblies with two-bolt assemblies. Rather, the recall provided for an update to the parking brake software that was intended to address a stationary failure. This did nothing to prevent the one-bolt design from failing.

19.     Defendant had superior or exclusive knowledge of material facts regarding the Mounting Bolt Defect due to: pre-production testing; design failure-mode analysis; aggregate part sales; consumer complaints about the Mounting Bolt Defect to Defendant's dealers; customer complaints made directly to Ford; dealer audits; aggregate warranty information; consumer complaints to NHTSA (see Ex. 1); consumer complaints on websites and internet

COMPLAINT - CLASS ACTION - 4

forums; testing done in response to those complaints; dealership repair orders; and other internal sources of information about the Defect.

20.     The Mounting Bolt Defect is material because, inter alia, it poses a safety concern. As attested by Class Members in complaints to NHTSA and online forums, the rear axle horizontal mounting bolt can suddenly fail, causing total loss of control of the Class Vehicle while driving, including the inability to maintain steering, braking, speed control, and responsiveness to safety threats, greatly increasing risk of collision.

21.     Defendant's failure to disclose the Mounting Bolt Defect and its associated safety risks has caused Plaintiffs and putative class members to lose the use of their vehicles and/or incur costly repairs that have conferred an unjust substantial benefit upon Defendant.

22.     Discovery will show that, in an effort to conceal the Mounting Bolt Defect, Defendant has instructed dealers to tell consumers their vehicles are "operating normally" or "operating as intended" when they are not. This is a common practice in the automotive industry. By denying the existence of a defect, manufacturers can play on the consumers' lack of technical expertise and avoid implementing potentially costly fixes for years, or at least until the vehicles are out of warranty. When remedial measures are taken, they are often through the issuance of service bulletins provided only to dealers that are narrowly crafted and underinclusive, as occurred here and set forth infra.

23.     Had Defendant disclosed the Mounting Bolt Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, would have paid less for them, or would have required Defendant to replace, or pay for the replacement of, the defective rear subframe assemblies with a non-defective version before their warranty periods expired.

## THE PARTIES

### Plaintiffs John Collier and Krysta Renfro

24.     Plaintiffs John Collier and Krysta Renfro are Washington citizens residing in Olympia, Washington.

COMPLAINT - CLASS ACTION - 5

25.     On or around October 19, 2021, Plaintiffs Collier and Renfro purchased a new 2021 Ford Explorer ST from Mullinax Ford of Olympia LLC, an authorized Ford dealership located in Olympia, Washington.

26.     Plaintiffs Collier and Renfro purchased their vehicle primarily for personal, family, or household use.

27.     Safety, reliability, and quality of the vehicle and its components were important factors in Plaintiffs Collier and Renfro's decision to purchase their vehicle. Before making their purchase, Plaintiffs Collier and Renfro researched the 2021 Ford Explorer ST online, by reviewing Ford's website, on which they "built" an Explorer to see various options, and the dealership's website. At the dealership, Plaintiffs Collier and Renfro also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle as well as various safety features. At no time did Ford or any employee of Mullinax Ford disclose the Defect. Accordingly, Plaintiffs Collier and Renfro believed that the 2021 Ford Explorer ST would be a safe and reliable vehicle.

28.     Defendant's omissions were material to Plaintiffs Collier and Renfro. Had Defendant disclosed its knowledge of the Mounting Bolt Defect before they purchased their vehicle, Plaintiffs Collier and Renfro would have seen and been aware of the disclosures. Furthermore, had they known of the Mounting Bolt Defect, Plaintiffs Collier and Renfro would not have purchased their vehicle or would have insisted Ford repair the defect.

29.     Over the Labor Day weekend in September 2022, Plaintiff Collier was driving Plaintiffs' vehicle at about 70 miles per hour on the freeway when the vehicle began to lose power. Plaintiff Collier managed to pull over on the side of the highway and attempted to put the vehicle in park. While doing so, he heard a very loud noise. The vehicle would not stay in park, instead rolling backwards, forcing Plaintiff Collier to use the emergency brake. When he got out of the vehicle and went to look at the back of the vehicle, he saw a broken seal on the rear

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

differential and smoke coming from the underside of the vehicle. At the time of the incident, the vehicle had approximately 15,000 miles on the odometer.

30.     On September 6, 2022, Plaintiff Collier had the vehicle towed to Mullinax Ford for diagnosis and repair. The dealership diagnosed the problem as a fracture of the rear axle bolt. As a result of the fracture, the driveline had separated from the rear differential and rear axle, damaging both. Ultimately, the dealership installed a new driveline and differential, as well as CV axles under warranty. In addition, the 2022 Recall was performed on the vehicle. However, the recall repair consisted only of a software update to engage the parking brake and prevent rollaway. The vehicle was returned to Plaintiffs Collier and Renfro on October 17, 2022.

31.     On approximately May 28, 2023, Plaintiff Renfro was driving the vehicle on a trip to Las Vegas. When she attempted to accelerate the vehicle from a stop at a traffic light, she heard a loud clunk and the vehicle refused to move. She managed to push the vehicle to the side of the road. At the time of the incident, the vehicle had approximately 26,639 miles on the odometer.

32.     Plaintiff Renfro had the vehicle towed to Friendly Ford, an authorized Ford dealership located in Las Vegas, Nevada. The dealership ultimately diagnosed the vehicle as needing replacement of the rear subframe bushing and the rear axle horizontal mounting bolt, which had fractured again. The dealership also noticed damage to the CV axle and the driveshaft. The vehicle also required repair to the front suspension. After the vehicle was repaired, the 2022 Recall was again performed.

33.     Plaintiffs Collier and Renfro have not received a permanent repair under warranty, and their vehicle continues to exhibit the Mounting Bolt Defect.

34.     As a result of the Mounting Bolt Defect, Plaintiffs Collier and Renfro have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiffs Collier and Renfro will be unable to rely on

COMPLAINT - CLASS ACTION - 7

the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Ford vehicle, although they would like to do so.

35.     At all times, Plaintiffs Collier and Renfro have driven and maintained their vehicle foreseeably, in a manner consistent with Ford's instructions, and consistent with their vehicle's intended use.

**Defendant Ford Motor Company**

36.     Defendant Ford Motor Company is a corporation organized and in existence under the laws of the State of Delaware and registered to do business in the states of Delaware, California, Maryland, and Virginia. Ford is headquartered in Dearborn, Michigan.

37.     Ford is responsible for manufacturing, sales, marketing, service, distribution, import, and export of Ford-branded products, including vehicles and parts, in the United States. Ford is also the warrantor and distributor of Ford vehicles, including the Class Vehicles, throughout the United States.

38.     In order to sell vehicles to the general public, Ford enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new Ford-branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties Ford provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to Ford instructions, issued through service manuals, TSBs, and other documents. Per the agreements between Ford and the authorized dealers, consumers like Plaintiffs are able to receive services under Ford's issued warranty at dealer locations that are convenient to them. These agreements provide Ford with a significant amount of control over the actions of the authorized dealerships. For example, discovery will show, Ford employees are

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

1    appointed as managers for particular regions of the United States and their responsibilities
2    include managing the day-to-day operations of the dealerships located within their regions.

3         39.     Discovery will also show that Ford also developed and disseminated the owner's
4    manual and warranty booklets, advertisements, and other promotional material relating to the
5    Class Vehicles. Defendant is also responsible for the production and content of the information
6    on the Monroney Stickers.

7         40.     Defendant is the drafter of the warranties it provides to consumers nationwide, the
8    terms of which unreasonably favor Defendant. Consumers are not given a meaningful choice in
9    the terms of the warranties provided by Defendant, and those warranties are offered on a "take it
10   or leave it" basis.

11   **JURISDICTION AND VENUE**

12        41.     This Court has subject matter jurisdiction under the Class Action Fairness Act of
13   2005 ("CAFA"), 28 U.S.C. §§ 1332(d), because the putative class numbers more than 100, the
14   aggregate amount in controversy exceeds $5,000,000 excluding costs and interest, and at least
15   one plaintiff—including Plaintiffs Collier and Renfro—is a citizen of a different state than
16   Defendant. This Court has supplemental jurisdiction over the state law claims alleged herein
17   under 28 U.S.C. § 1367.

18        42.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial
19   part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Ford has
20   marketed, advertised, and sold Class Vehicles in this District, including those purchased by
21   Plaintiffs Collier and Renfro, and otherwise conducted extensive business in this District, causing
22   harm to additional Class Members residing in this District.

23   **FACTUAL ALLEGATIONS**

24        43.     Defendant designed, manufactured, distributed, warranted, and marketed the
25   Class Vehicles. According to publicly available information, consumers purchased more than
26

COMPLAINT - CLASS ACTION - 9

1  400,000 Class Vehicles, and discovery will show that many thousands of these were purchased
2  in Washington.

3        44.    Defendant provided all purchasers or lessees of the Class Vehicles with the
4  NVLW. The terms of this warranty are non-negotiable, and Defendant exercises sole authority
5  in determining whether and to what extent a particular repair is covered under the warranties it
6  offers.

7        45.    The NVLW provided by Ford includes basic bumper to bumper warranty
8  coverage, and states, in relevant part:

9
10      Your NEW VEHICLE LIMITED WARRANTY gives you specific legal
    rights. You may have other rights that vary from state to state. Under your
11  New Vehicle Limited Warranty if:

12      - your Ford vehicle is properly operated and maintained, and

13      - was taken to a Ford dealership for a warranted repair during the warranty
14  period,

15      then authorized Ford Motor Company dealers will, without charge, repair,
    replace, or adjust all parts on your vehicle that malfunction or fail during
16  normal use during the applicable coverage period due to a manufacturing
    defect in factory-supplied materials or factory workmanship.
17

18
19        46.    "The subframe is a critical element between the road loads and the passenger
20  compartment. It acts as a mount structure for the suspension and it reacts to vehicle travel on
21  corners, on bumps, and acceleration and braking."[2] The subframe is the structure below the frame
22  to which the suspension, axles and drivetrain components are mounted. The purpose of the
23  subframe is to spread the load of the frame over a wider area and dampen the vibrations of the
24  powertrain such that they do not reach the passenger compartment. In order to accomplish these
25  tasks, the subframe is subject to torsional (or twisting) loads, and as such, needs to be made of

26    [2] Aluminum Extruders Council, "Subframes & Engine Cradles" available at: https://aec.org/page/subframes-engine-cradles#:~:text=The%20subframe%20is%20the%20structure,axle%2C%20suspension%2C%20and%20powertrain (last accessed Mar. 8, 2023)

COMPLAINT - CLASS ACTION - 10

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

sufficient materials and mounted in such a way that those loads do not overwhelm, i.e. fracture or warp, those materials.

47.     The subframe is an essential component to vehicle stability and dynamics and ultimately, the overall safety of vehicle, especially while in motion. The rear subframe is particularly critical for vehicles that are designed to send high torsional loads to the rear axle, including rear-wheel drive vehicles.

48.     Symptoms of the deterioration of a rear subframe or its related components, such as bushings, due to high torsion include: wheel misalignments, which compromise the vehicle's responsiveness to steering; premature wear on suspension and drivetrain components; pulling to the side while braking; clunking or rattling noises, especially when going over bumps; loosening of the rear differential such that it may detach and damage the suspension or drivetrain components; and catastrophic failure, in which the rear subframe itself and attached components like the rear axle detach from the vehicle while in motion.

49.     The defective single-bolt assembly is pictured below.

Fig. 1 – Rear Subframe Assembly with One Rear Axle Mounting Bolt



TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Fig. 2 – Close Up of One Rear Axle Mounting Bolt in Fig. 1, as Attached to Vehicle



50.     Discovery will show that all Class Vehicles' rear subframe Assemblies are designed, manufactured, and installed by Defendant in substantially the same manner.

51.     Discovery will confirm that the Mounting Bolt Defect in all Class Vehicles is caused by improperly designed, manufactured, and/or installed rear subframe Assemblies in the Class Vehicles, including the use of only one bolt.

52.     The Mounting Bolt Defect is inherent in, and the same for, all Class Vehicles.

53.     Discovery will show that Defendant was aware of material facts regarding the Mounting Bolt Defect, in particular as a result of pre-production testing, manufacturing quality control audits, and early post-sale complaints by consumers who purchased the Class Vehicles and experienced the Mounting Bolt Defect. Despite this knowledge, Defendant failed to disclose the Mounting Bolt Defect and its associated safety risk to consumers. As a result of this failure, Plaintiffs and Class Members have been damaged.

54.     In 2020, Ford released a performance-oriented trim, the Ford Explorer ST. Demonstrating that it is practicable to build the Explorer safely, the rear subframes in some of

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

these vehicles were designed and manufactured properly because Ford used two rear axle horizontal mounting bolts, as pictured below:

Fig. 3 – Rear Subframe Assembly with Two Rear Axle Mounting Bolts



Fig. 4 – Close Up of Two Rear Axle Mounting Bolts in Fig. 2, as Attached to Vehicle



55.     Indeed, Ford marketed the Class Vehicles as not only being capable of providing safe and reliable transportation, in broadcast commercials on television and on the internet, but also as "Built for Life's Adventures . . . empowering adventure-seekers and active families to pack up their gear, load up the gang, and head out."

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

56.     In particular, Ford touted that the all new 2020 Explorer came with a functional rear-wheel drive or all-wheel drive which would provide "Dynamic on- and off-road capability" and "exceptional towing capacity."  As described by Ford, these were "just some of the reasons we switched the 2020 Ford Explorer to a new RWD architecture."

57.     Ford also described the 2.3L EcoBoost engine as having an "overboost function that lifts output on every gear change," with more horsepower and more towing capacity, up to 3,000 lbs., than previous iterations.  The 3.0L engine was described as having best-in-class torque for the enhanced engine and being able to "merg[e] onto the highway. Or pass[] on a two-lane. You have the capability you need, whenever you need it."  This engine was included on the Ford Explorer ST trim, which was also described as being "tuned by engineers at Ford Performance," with 415-lb-ft of torque and sport tuned suspension for an "even more engaging driving experience." However, at no time did Ford reveal this performance, or even the basic ability of the vehicle to be driven without the rear subframe becoming detached, would be undermined by the use of an inferior subframe attached with a single bolt.

58.     For the 2021 Ford Explorer, Ford advertised that the vehicle was a 2020 IIHS Top Safety Pick Plus winner that "help get you where you want to go," without revealing the Defect or its associated safety risk.  Again, vehicles with the 3.0L engine were promoted as having "best-in-class V6 horsepower and torque [that] gives you the commanding performance you're looking for."  Vehicles with the 2.3L engine were promised more horsepower and more towing capacity. At no time did Ford mention that the power and torque provided by the engines could and would displace, warp, or break the horizontal bolt on the rear subframe, distort or destroy the bushings on the subframe (which mitigate vibration), damage the rear axle of the vehicle, disconnect the rear differential, and/or damage drive train components.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

**The Mounting Bolt Defect Poses an Unreasonable Safety Hazard**

59.     The Mounting Bolt Defect poses an unreasonable safety hazard. The Mounting Bolt Defect can cause drivers to lose control of their Class Vehicles while driving, which in turn increases the likelihood of collision.

60.     Federal law requires automakers like Defendant to be in close contact with NHTSA regarding potential automobile defects, and it imposes a legal requirement (backed by criminal penalties) compelling automakers to make confidential disclosure of defects and related data to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act*, Pub. L. No. 106-414, 114 Stat.1800 (2000).

61.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those that are safety related. *Id.* Thus, Defendant knew or should have known of the many complaints about the Mounting Bolt Defect logged by the NHTSA Office of Defects Investigation (ODI). *See* Exhibit 1 attached. The content, consistency, and disproportionate number of these complaints alerted, or should have alerted, Defendant to the Mounting Bolt Defect.

62.     With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Mounting Bolt Defect available through NHTSA's website, www.safercar.gov. *See* Ex. 1. These complaints further demonstrate that Ford was or should have been aware of the Mounting Bolt Defect.

63.     Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning. The complaints also indicate Defendant's awareness of the problems with the rear subframe and how potentially dangerous the Defect is for consumers, not only to the extent such complaints reference contact

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

1    with Defendant itself, but also because Ford employs staff to monitor the perception of the brand.

2    *See* Ex. 1.

3    **<u>Defendant Had Superior and Exclusive Knowledge of the Mounting Bolt Defect</u>**

4          64.     Defendant had superior and exclusive knowledge of the Mounting Bolt Defect

5    and knew or should have known that the Defect was not known or reasonably discoverable by

6    Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

7          65.     Discovery will show that before Plaintiffs purchased their Class Vehicles, and

8    since at least 2019, Defendant knew the Class Vehicles required two rear axle mounting bolts.

9    Since at least the beginning of 2020 (and likely since 2018 or 2019, when Ford would have had

10   testing data), Defendant knew about the Mounting Bolt Defect through sources not available to

11   consumers, including pre-release testing data, early consumer complaints to Defendant and its

12   dealers, high failure rates and replacement part sales data, consumer complaints to NHTSA

13   (which Defendant monitors) (*see* Ex. 1), and through other aggregate data from Defendant's

14   dealers about the problem. The TSBs developed by Defendant to address the Mounting Bolt

15   Defect also demonstrate Defendant's knowledge: TSBs are issued exclusively to Defendant's

16   dealerships and service providers and are not disseminated to consumers, even if their vehicles

17   receive services as outlined in the bulletins.

18         66.     While designing, manufacturing, engineering, and testing Class Vehicles in

19   advance of the vehicles' release, Ford would have gained comprehensive and exclusive

20   knowledge about what was needed for the rear subframe on the re-designed 2020 Ford Explorer

21   to withstand the output of the vehicles' engines. Adequate and industry-standard pre-release

22   analysis of the design, engineering, and manufacture of these vehicles for durability would have

23   revealed to Ford that the design and/or manufacture of the vehicles with the inferior subframe

24   attached with a single horizontal bolt was insufficient to keep the vehicle intact.

25         67.     Defendant is experienced in the design and manufacture of consumer vehicles. As

26   an experienced manufacturer, Defendant conducts tests, including pre-sale durability testing, on

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

incoming components, including the rear subframe and the bolts by which the rear subframe is attached, to verify the parts are free from defect and align with Defendant's specifications.[3] Thus, Defendant knew or should have known the rear subframe was defective and prone to putting drivers in a dangerous position due to the inherent risks of the Mounting Bolt Defect.

68.     Ford touts its extensive pre-production testing, both in the United States at its Michigan and Arizona Proving Grounds, and at testing centers throughout the world, including in the United Arab Emirates, Thailand, China, Australia, and India. Indeed, pre-production durability testing of the vehicles with Ford's Total Durability Cycle necessarily would have revealed the Defect and its associated safety risk. Despite this, Ford manufactured hundreds of thousands of vehicles with the defective rear subframe, including the Class Vehicles.

69.     Additionally, discovery will show that Defendant knew of the impact of the Defect from the sheer number of reports it received from dealerships. Defendant's customer relations department, which interacts with individual dealerships to identify potential common defects, has received numerous reports regarding the Defect, which led to the release of TSBs and other dealer communications. Defendant's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

70.     Defendant's warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Defendant's policy that when a repair is made under warranty, the dealership must provide Defendant with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendant because they will not

---

[3]  Akweli Parker, *How Car Testing Works*, HowStuffWorks.com, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last visited June 6, 2022).

COMPLAINT - CLASS ACTION - 17

be reimbursed for any repairs unless the justification for reimbursement is sufficiently documented.

71.     Ford first issued Special Service Message ("SSM") 50471 in February 2022 for Model Year ("MY") 2020–2022 Ford Explorer vehicles, advising that "[s]ome 2020-2022 Explorer vehicles may exhibit a rear axle mounting bolt that has broken." Ford explained that, "[i]n order to correct the condition, the rear subframe, differential cover, and mounting bolts will need to be replaced in addition to any other damaged components."

72.     On April 14, 2022, Ford issued a Safety Recall Report (Manufacturer Recall No. 22S27) recalling 2020–2022 Ford Explorer 2.3L RWD / 3.0L PHEV / 3.3 L FHEV Retail / 3.0L ST gas vehicles.[4] The Safety Recall Report ("Recall" or "2022 Recall") explained that the affected vehicles are "equipped with suspect rear axle bolts and and [sic] an older version of Electronic Park Brake Software."

73.     The Recall described the Defect as follows:

> Affected vehicles were built with a 3-point mounted axle design. On some units the rear axle horizontal mounting bolt may fracture. Powertrain torque through the driveline causes axle rotation of the pinion angled towards the subframe, which exerts a bending force on the rear axle bolt. Peak torque is normally experienced during a launch event. After numerous peak torque events are experienced, the bolt may suffer a fatigue failure, which will lead to the axle housing moving out of position, resulting in a condition described by customers and dealer technicians variably as loud, grinding, binding, or clunking noises.

74.     The Recall describes the safety risk of this defect as follows:

> If the rear axle bolt breaks, the driveshaft/half shafts may become disconnected, resulting in loss of transmission torque to the rear wheels which is necessary to hold the vehicle in park. If the parking brake is not applied, the loss of the primary park torque will allow the vehicle to roll in park increasing the risk of crash and injury.

---

[4] Recall No. 22S27 also included two types of Ford Explorer police vehicles that are not sold to the general public and are not a part of this Complaint.

COMPLAINT - CLASS ACTION - 18

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

75.     The above-described issues occurs without warning according to the Safety Report ("Identification of Any Warning that can Occur: NA").  The Remedy Program initiated as part of the recall merely instructs affected vehicle owners to take their vehicle to a Ford or Lincoln dealer to have the PCM software updated to engage the Electronic Park Brake when Park is commanded."

76.     In June 2022, Ford began Customer Satisfaction Program 22N06, which provided a "one-time repair (if needed) to the parts required to replace a rear subframe bushing and axle cover due to a rear axle bolt bending and fracturing for ten (10) years of service or 150,000 miles from the warranty start date of the vehicle, whichever occurs first."

77.     On April 19, 2022, Ford issued a Delivery Hold to all U.S. Ford and Lincoln Dealers pursuant to the Recall that stated, "[i]n some of the affected vehicles, the rear axle mounting bolt may fracture during vehicle acceleration. A fractured rear axle bolt will allow the rear axle housing to move out of position, resulting in severe noise and vibration." If the driveshaft/half shafts become disconnected and there is loss of transmission torque to the rear wheels, there could be a consequential loss of power while the vehicle is being driven. The driver could also lose complete control of the vehicle. This vastly increases the risk of safety hazards, including collisions. In such cases, a software update that engages the Electronic Parking Brake when in Park does nothing to remedy the defect, and a one-time repair that is only provided once the bolt has already fractured requires consumers to brave the safety risks before an adequate remedy is provided under warranty. Discovery will show that the problem persists despite Ford's software update Recall, as a result of the Defect as described herein.

78.     The Recall also included a Chronology of Defect/Noncompliance Determination (the "Chronology"). Per the Chronology, Ford was undeniably aware of the Mounting Bolt Defect as early as August 2021 when it reviewed warranty claims.

79.     On March 30, 2023, Ford issued a second recall related to the Defect, for 2020–2022 2.L rear-wheel drive, 3.3L, 3.3 Hybrid, and 3.0L ST Ford Explorers that did not receive the

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

previous recall despite having their vehicles serviced for the 2022 Recall Ford acknowledged that these vehicles in Recall 23V-199 "received a previous Powertrain Control Module update which did not include an Electronic Parking Brake apply when the vehicle was shifted into park, as intended." Ford listed the cause of this as "[t]he recall program was launched before all the software calibrations were available for dealers." According to the chronology submitted with the recall, Ford became aware of this problem in January 2023.

80.     On June 20, 2023, NHTSA opened an investigation into rear- axle- bolt failures in 2020–2022 Ford Explorers.  NHTSA estimated there were 710,253 of these vehicles.  NHTSA noted that the previous recalls "addressed the rear axle horizontal mounting bolt that may fracture and cause the driveshaft to disconnect.  The fracturing of the rear axle bolt can allow the rear axle housing to move out of position, resulting in severe noise, vibration and/or a disconnected driveshaft . . . . Ford's remedy was to add a software update which automatically applies the electronic service parking brake to keep the vehicle from rolling away in the event of a driveshaft failure.  However, **there is no safety remedy addressing the failed rear axle horizontal mounting bolt which is the basis of this safety issue and the cause of the impaired vehicle**." (emphasis added)

81.     NHTSA had opened the investigation after receiving two reports of consumers alleging motive power loss or loss of transmission torque as a result of the rear- axle- bolt failures, despite having been serviced by the recalls.  In fact, Class Members made multiple reports to NHTSA regarding problems they experienced as a result of their Class Vehicles receiving the Recall.  *See* Ex. 1.

82.     However, Ford was aware in at least 2019, and likely several years before, that the Class Vehicles required the two rear axle mounting bolts, as evidenced by Ford's presale design and testing of the 2020 Ford Explorer ST, the specs for which—researched and created by Ford itself—required two rear axle mounting bolts, *exactly the design and manufacture Ford should have used in the Class Vehicles* in the manufacturing process.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

83.     Discovery will show that each TSB, customer satisfaction program, and service action issued by Defendant was approved by managers, directors, or executives at Ford. Therefore, discovery will show that Defendant's managers, directors, or executives knew, or should have known, about the Mounting Bolt Defect, but refused to disclose the Mounting Bolt Defect to prospective purchasers and owners, and/or actively concealed the Mounting Bolt Defect.

84.     The existence of the Mounting Bolt Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. *See* Ex. 1 (complaints to NHTSA from consumers regarding the Mounting Bolt Defect). Had Plaintiffs and other Class Members known of the Mounting Bolt Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them at all.

85.     Reasonable consumers, like Plaintiffs, expect that a vehicle's rear subframe is safe, will function in a manner that will not pose a safety risk and will stay securely fastened, and is free from defects. Plaintiffs and Class Members further reasonably expect that Defendant will not sell or lease vehicles with known safety defects, such as the Mounting Bolt Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Defendant to conceal and fail to disclose the Mounting Bolt Defect to them and to then continually deny its existence.

**Defendant Has Actively Concealed the Mounting Bolt Defect**

86.     Despite its knowledge of the Mounting Bolt Defect in the Class Vehicles, Defendant actively concealed the existence and nature of the Defect from Plaintiffs and Class Members. Specifically, Defendant failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

(a)     any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the rear subframe;

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

(b)   that the Class Vehicles, including the rear subframe, were not in good working order, were defective, and were not fit for their intended purposes; and

(c)   that the Class Vehicles and their rear subframes were defective, despite the fact that Defendant learned of such defects as early as 2019, if not earlier.

87.   Discovery will show that when consumers present their Class Vehicles to an authorized Defendant's dealer for rear subframe repairs, rather than repair the problem under warranty, Defendant's dealers either inform consumers that their vehicles are functioning properly or conduct repairs that merely mask the Mounting Bolt Defect. For example, dealers will perform a software update, and they will replace the rear subframe only once and only if the rear subframe bolt fails.

88.   Defendant has caused Plaintiffs and Class Members to expend money and/or time to diagnose, repair or replace the Class Vehicles' rear subframe and/or related components, despite Defendant's knowledge of the Mounting Bolt Defect.

**Defendant Has Unjustly Retained a Substantial Benefit**

89.   Discovery will show that Defendant unlawfully failed to disclose the Defect to induce Plaintiffs and other putative Class Members to purchase or lease the Class Vehicles.

90.   Defendant thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' and Class Members' purchases or leases.

91.   As discussed above, therefore, Defendant unlawfully induced Plaintiffs to purchase or lease their Class Vehicles by concealing a material fact (the defective rear subframe), and they would have paid less for the Class Vehicle, or not purchased it at all, had they known of the Defect.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

92.     Accordingly, Defendant should be ordered to disgorge its ill-gotten gains: benefits accrued in the form of increased sales and profits resulting from the material omissions that did—and likely will continue to—deceive consumers.

**The Vehicle Warranties Instruct Plaintiffs to Seek Repairs at Authorized Dealerships**

93.     To sell vehicles to the general public, Ford enters into agreements with its networks of authorized dealerships to engage in retail sales with consumers such as Plaintiffs while also advertising the warranties it provides directly to consumers when they purchase a Ford-branded vehicle from the authorized dealership. These agreements specifically authorize the dealerships to act in Ford's stead to provide repairs under the warranties Ford provides directly to consumers. Accordingly, discovery will show, particularly the dealership agreements between Defendant Ford and third-party dealerships, that Defendant Ford has authorized these dealerships to be its agents for the purposes of warranty repairs to provide warranty repairs on its behalf, including diagnosis of whether warranty repairs are required., and as such, the consumers are third-party beneficiaries of these dealership agreements because they benefit from being able to purchase vehicles and receive warranty repairs locally. Discovery will show that because Plaintiffs and members of the Class are third-party beneficiaries of the dealership agreement which create an implied warranty of merchantability of the goods being sold by these authorized dealerships, they may avail themselves of the implied warranty against Defendant. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

94.     Plaintiffs and each of the members of the Class are the intended beneficiaries of the express and implied warranties that accompany each Class Vehicle. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Ford. These warranties were designed for and intended to

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

benefit the consumers only. The consumers are the true intended beneficiaries of the express and implied warranties, and the consumers may therefore avail themselves of those warranties.

95.    Ford issued the express warranty to Plaintiffs and the Class Members. Ford also developed and disseminated the owner's manuals and warranty booklets that direct consumers to take their vehicles to authorized dealerships for diagnosis and repair. Ford also developed and disseminated the advertisements, such as vehicle brochures and television commercials, and other promotional materials relating to the Class Vehicles, which promoted the terms of the warranties that they issue with the sale of each Class Vehicle. Ford is also responsible for the content of the Monroney Stickers on its vehicles. Because Ford issues the express warranties directly to consumers, Plaintiffs and Class Members are in direct privity with Ford with respect to the warranties.

96.    In promoting, selling, and repairing their defective vehicles, Defendant authorizes dealerships to provide repairs that are the responsibility of Ford to provide under Ford's warranties. Ford fulfills its responsibilities under the warranties by, among other things, requiring the following:

>    (a)    The authorized dealerships complete all service and repair according to instructions disseminated directly to them by Ford, including service manuals, TSBs, SSMs, and other documents drafted by Ford;

>    (b)    Technicians at the dealerships are required to attend Ford-given trainings yearly in order to remain certified to work on Ford-branded vehicles, at which they receive training on proprietary systems and are provided step-by-step instructions on diagnosing and repairing Ford-branded vehicles;

>    (c)    Consumers are able to receive services under Ford's issued NVLW only at authorized dealerships, and they are able to receive these services because of the agreements between Ford and the authorized dealers;

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

(d)    The warranties provided by Ford for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(e)    Ford manages the way dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with Ford's authorization;

(f)    Ford has entered into agreements and understandings with their authorized dealers pursuant to which they manage the dealers' interaction with the public, including the advertising of the Class Vehicles, the terms and conditions of the express warranties, and the terms under which consumers may avail themselves of the remedies under those express warranties; and

(g)    Ford implemented its express and implied warranties as they relate to the Defect alleged herein by instructing authorized Ford dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs and the Recall cited herein.

(h)    Indeed, the Ford warranty booklet makes it abundantly clear that only its authorized dealerships can provide warranty service. The booklets, which are plainly written for the consumers, not the dealerships, tell consumers that to obtain warranty service, their Ford vehicle must be "taken to a Ford dealership for a warranted repair during the warranty period." (Ford Warranty).

## TOLLING OF THE STATUTES OF LIMITATION

97.    Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the Mounting Bolt Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably discover the Mounting Bolt Defect or

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

Defendant's deception with respect to the Mounting Bolt Defect. Defendant and its agents continue to deny the existence and extent of the Mounting Bolt Defect, even when questioned by Plaintiffs and members of the Class. Instead, Defendant decided to release an ineffective software update as a "recall" for the Mounting Bolt Defect.

98.     Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was concealing a defect and/or that the Class Vehicles contained the Mounting Bolt Defect and the corresponding safety risk. As alleged herein, the existence of the Mounting Bolt Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Mounting Bolt Defect or that the Defendant was concealing the Mounting Bolt Defect.

99.     At all times, Defendant is and was under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, and grade of the Class Vehicles and to disclose the Mounting Bolt Defect and corresponding safety risk due to its exclusive and superior knowledge of the existence and extent of the Mounting Bolt Defect in Class Vehicles.

100.     Defendant knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendant's knowing, active, and affirmative concealment.

101.     For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's fraudulent concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

102.     Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure

COMPLAINT - CLASS ACTION - 26

23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

103.    The Class is defined as:

**Nationwide Class**:  All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

In the alternative, Plaintiffs bring claims on behalf of:

**Washington Class**:  All persons and entities who purchased or leased a Class Vehicle in the State of Washington (the "Washington Class").

104.    Excluded from any proposed class is: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned, his or her immediate family members, and the Judge's staff; and (3) any Judge who may hear an appeal of any judgment entered. Plaintiffs reserve the right to amend the Class definitions if discovery and further investigation reveal that the Class should be expanded or otherwise modified.

105.    Numerosity:  Although the exact number of Class Members is uncertain, and can be ascertained only through appropriate discovery, the number is significant enough such that joinder is impracticable, and numbers at least in the thousands. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

106.    Typicality:  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendant. The representative Plaintiffs, like all Class Members, have been damaged by Defendant's misconduct in that they have incurred or will incur the cost of repairing

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

or replacing the defective rear subframe and/or its components. Furthermore, the factual bases of Defendant's misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

107.    Commonality:  There is at least one question that is common to all proposed Class Members, the answer to which will advance resolution of this litigation. For example:

(a)    Whether Class Vehicles suffer from defects relating to the rear subframe;

(b)    Whether the defect relating to the rear subframe constitutes an unreasonable safety risk;

(c)    Whether Defendant knew about the defect pertaining to the rear subframe and, if so, how long Defendant has known of the defect;

(d)    Whether the defective nature of the rear subframe constitutes a material fact;

(e)    Whether Defendant has had an ongoing duty to disclose the defective nature of the rear subframe to Plaintiffs and Class Members;

(f)    Whether Plaintiffs and the other Class Members are entitled to equitable relief, including a preliminary and/or a permanent injunction;

(g)    Whether Defendant knew or reasonably should have known of the defect pertaining to the rear subframe before it sold and leased Class Vehicles to Class Members;

(h)    Whether Defendant should be declared financially responsible for notifying the Class of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective rear subframe and/or its components;

(i)    Whether Defendant is obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective rear subframe and/or its components;

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

(j)     Whether Defendant breached the implied warranty of merchantability under Washington law;

(k)     Whether Defendant breached their express warranties under Washington law;

(l)     Whether Defendant violated the consumer protection laws of Washington;

(m)    Whether Plaintiffs and Class Members are entitled to treble damages under the Washington Consumer Protection Act, RCW 19.86;

(n)     Whether Defendant breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act; and

(o)     Whether Defendant breached express warranties pursuant to the Magnuson-Moss Warranty Act.

108.    <u>Adequate Representation</u>:  Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer protection and product defect class actions, and those attorneys intend to vigorously prosecute this action.

109.    <u>Predominance</u>: As indicated above, there are numerous questions that will produce a uniform answer for all proposed Class Members. Such common answers are more important to the resolution of this litigation than the answer to any question that is individualized, and thus common questions predominate over any individualized inquiry.

110.    <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

## COUNT I

### Breach of Express Warranty

### Wash. Rev. Code §§ 62A.2-313 and 62A.2A-210

111.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

112.    Plaintiffs bring this count on behalf of themselves and the Class against Defendant.

113.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under § 62A.2-103(1)(d).

114.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

115.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

116.    The rear subframe assemblies were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

117.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, Ford's express warranty is an express warranty under Washington law.

118.    Ford's New Vehicle Limited Warranty expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long the Vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

119.    Ford further provides powertrain warranty coverage, which is applicable to the engine and drivetrain, including axle shafts, rear bearings, drive axle housing (which includes internal parts, driveshaft, retainers, supports, seals, gaskets, universal and constant velocity

COMPLAINT - CLASS ACTION - 30

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

joints), as well as the components in the transmission, including the torque converter. This coverage applies for 5-years or up to 60,000 miles, whichever comes first.

120.    For certified pre-owned ("CPO") Vehicles, Ford offers an additional limited warranty covering CPO Vehicles for 12 months or 12,000 miles, whichever comes first.

121.    Ford's CPO Vehicle Warranty states that a dealer will replace "all covered components . . . that are found to be defective in factory-supplied materials or workmanship during the applicable warranty periods." The engine and its components—including the cylinder block and cylinder heads—are included in Ford's list of "covered components."

122.    Ford manufactured and/or installed the engines and the engines' component parts in the Class Vehicles, and the engines and their component parts are covered by the express warranties.

123.    Defendant's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was reached when Plaintiffs and members of the Class purchased or leased the Class Vehicles with the defective rear subframe and/or related components.

124.    Plaintiffs and members of the Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Plaintiffs and members of the Class that the Class Vehicles were equipped with defective rear subframes and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

125.    Ford breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

126.    Privity is not required here because Washington Plaintiffs and members of the Proposed Class Washington Sub-Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers, and specifically, of Ford's express warranties,

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned CPO Vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and or have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only. Strict privity is not required here because Defendant, as the manufacturer of the Class Vehicles, made express representations to Plaintiffs and the Class regarding its warranties.

127.    Any attempt by Ford to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Ford knowingly sold or leased defective products without informing consumers about the Defect. The time limits are unconscionable and inadequate. And among other things, a gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Ford and members of the Class.

128.    Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the members of the Class whole, because Ford has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair within a reasonable time.

129.    Plaintiffs and members of the Class provided notice to Ford of the breach of express warranties when they took their vehicles to Ford-authorized providers of warranty repairs. Plaintiffs also provided written notice to Ford via letter dated July 10, 2023.

130.    As a result of Ford's breach of the applicable express warranties, owners and lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and value of their Class Vehicles. Plaintiffs and the Proposed class have accordingly been damaged in an amount to be determined at trial.

131.    As a result of Ford's breach of the express warranty, Plaintiffs and the Class are entitled to legal and equitable relief against Ford, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**<u>COUNT II</u>**

**Breach of the Implied Warranty of Merchantability**

**Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212**

132.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

133.    Plaintiffs bring this count on behalf of themselves and the Class against Defendant.

134.    Ford is and was at all relevant times a "merchant" with respect to motor vehicles under Wash. Rev. Code §§ 62A.2-104(1) and 62A.2A-103(1)(t), and a "seller" of motor vehicles under § 62A.2-103(1)(d).

135.    With respect to leases, Ford is and was at all relevant times a "lessor" of motor vehicles under Wash. Rev. Code § 62A.2A-103(1)(p).

136.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Wash. Rev. Code §§ 62A.2-105(1) and 62A.2A-103(1)(h).

137.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Wash. Rev. Code §§ 62A.2-314 and 62A.2A-212.

138.    Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Ford directly sold and marketed Class Vehicles to customers through authorized dealers, like those from which Plaintiffs and members of the Class bought or leased their vehicles, for the intended purpose of consumers purchasing the Class Vehicles. Ford knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiffs and members of the Class, with no modification to the defective Class Vehicles.

139.    Ford provided Plaintiffs and members of the Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class

COMPLAINT - CLASS ACTION - 33

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

Vehicles suffered from an inherent defect at the time of sale and thereafter, and they are not fit for their particular purpose of providing safe and reliable transportation.

140.     This implied warranty included, among other things: (i) a warranty that the Class Vehicles that Ford manufactured, supplied, distributed, and/or sold were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

141.     Contrary to the applicable implied warranties, the Class Vehicles, both at the time of sale and thereafter, were not fit for their ordinary and intended purpose of providing Plaintiffs and the Class with reliable, durable, and safe transportation. Instead, the Class Vehicles were defective at the time of sale or lease and thereafter as more fully described above. Ford knew of this defect at the time these sale or lease transactions occurred.

142.     As a result of Ford's breach of the applicable implied warranties, Plaintiffs and members of the Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Plaintiffs and the Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

143.     Ford's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Washington Uniform Commercial Code.

144.     Plaintiffs and the Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Ford's conduct described herein.

145.     Privity is not required here because Plaintiffs and the Class are intended third-party beneficiaries of contracts between Ford and its distributors and dealers. Ford knew who purchased the Class Vehicles, knew the purpose for which they were purchasing them, knew the

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

Class's requirements for the Class Vehicles, delivered the Class Vehicles, and/or attempted repairs of the Class Vehicles.

146.    Plaintiffs and members of the Class were not required to notify Ford of the breach because affording Ford a reasonable opportunity to cure its breach of warranty would have been futile. Ford was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Members and through other internal sources.

147.    As a direct and proximate cause of Ford's breach, Plaintiffs and members of the Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Plaintiffs and members of the Class have incurred or will incur economic damages in the form of the cost of repair as well as additional losses.

148.    As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and members of the Class have been damaged in an amount to be proven at trial.

### COUNT III

**Violations of the Washington Consumer Protection Act**

**Wash Rev. Code § 19.86.010, *et seq.***

149.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

150.    Plaintiffs and members of the Proposed Class are "persons" within the meaning of Wash. Rev. Code § 19.86.010(2).

151.    The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.020. Ford engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Washington CPA.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

152.     Ford participated in unfair or deceptive trade practices that violated the Washington CPA. By failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and that stood behind its vehicles after they were sold, Ford knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. Ford systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Mounting Bolt Defect in the course of its business.

153.     Ford also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment in connection with the sale of the Class Vehicles.

154.     Ford's unfair and deceptive acts or practices occurred repeatedly in Ford's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

155.     Ford knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

156.     Ford knew or should have known that its conduct violated the Washington CPA.

157.     Defendant had a duty to Plaintiffs and Class Members because:

(a)     Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

(b)     Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

(c)     Defendant actively concealed the defective nature of the Class Vehicles at the time of sale and thereafter.

158.     By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

COMPLAINT - CLASS ACTION - 36

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

159.    The facts Ford concealed or failed to disclose are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease the Class Vehicles, or what to pay for them. Whether a vehicle's rear subframe is defective, which can cause the rear differential and rear axles to detach from the driveshaft and roll away when parked, is a material safety concern. Had Plaintiffs and Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

160.    Reasonable consumers do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

161.    As a result of Defendant's misconduct, Plaintiffs and the Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

162.    Ford's violations present a continuing risk to Plaintiffs and the Class Members as well as to the general public. Ford's unlawful acts and practices complained of herein affect the public interest.

163.    Ford is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including punitive damages, attorneys' fees, costs, and any other remedies the Court may deem appropriate under Wash. Rev. Code § 19.86.090. The Court should also exercise its discretion to increase the award of damages to each Class Member by three times their actual damages, not to exceed $25,000 per Class Member.

## <u>COUNT IV</u>

**Breach of Express Warranty under the Magnuson-Moss Warranty Act,**

**15 U.S.C. § 2303 *et seq*.**

164.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

165.    Plaintiffs bring this cause of action on behalf of himself and on behalf of the Class against Defendant.

166.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described *infra*, which became a material part of the bargain.

167.    The rear subframe assembly and its component parts were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

168.    Ford's New Vehicle Limited Warranty ("NVLW") expressly states that Ford will "without charge, repair, replace, or adjust all parts on your vehicle that malfunction or fail during normal use during the applicable coverage period due to a manufacturing defect in factory-supplied materials or factory workmanship" so long as the vehicle is properly operated and maintained and taken to a Ford dealership for repair within the warranty period.

169.    Defendant breached the express warranties by selling and leasing Class Vehicles with rear subframes that were defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, the rear subframe and its component parts. Defendant has failed to "repair" the defects as alleged herein.

170.    Plaintiffs were not required to notify Defendant of the breach because Defendant was on notice of the Defect from complaints and service requests it received from Class Members, from repairs and/or replacements of the rear subframe, and from other internal sources.

171.    Plaintiffs also provided notice to Defendant of their breach of warranty claims under the MMWA by letter dated July 10, 2023.

172.    As a direct and proximate cause of Defendant's breach, Plaintiffs and the other Class Members have suffered, and continue to suffer, damages, including economic damages at the point of sale or lease. Additionally, Plaintiffs and the other Class Members have incurred or will incur economic damages in the form of the cost of repair.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

173.    Plaintiffs and the other Class Members are entitled to legal and equitable relief against Defendant, including actual damages, consequential damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT V

### (Breach of Implied Warranty under the Magnuson-Moss Warranty Act,

### 15 U.S.C. § 2303 *et seq*.)

174.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

175.    Plaintiffs bring this cause of action on behalf of themselves and the Class against Defendant.

176.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

177.    Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

178.    Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

179.    Defendant impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their rear subframes that Ford manufactured, supplied, distributed, and/or sold would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their rear subframes would be fit for their intended use while the Class Vehicles were being operated.

180.    Contrary to the applicable implied warranties, the Class Vehicles and their rear subframes at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead,

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

the Class Vehicles are defective, including the defective design, manufacturing, and materials of their rear subframes.

181.    Defendant's breach of implied warranties has deprived Plaintiffs and Class Members of the benefit of their bargain.

182.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

183.    Defendant has been afforded a reasonable opportunity to cure its breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and rear subframes repair.

184.    As a direct and proximate cause of Defendant's breach of implied warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial. Defendant's conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

185.    As a result of Defendant's violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class Members have incurred damages.

186.    Plaintiffs also provided notice to Defendant of its breach of warranty claims under the MMWA by letter dated July 10, 2023.

## <u>COUNT VI</u>

### (For Fraud by Omission or Fraudulent Concealment)

187.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

188.    Plaintiffs bring this cause of action on behalf of themselves and the Class.

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

189.    Defendant knew that the Class Vehicles suffered from an inherent Mounting Bolt Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

190.    Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

191.    Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

    (d)    Defendant was in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

    (e)    The omitted facts were material because they directly impact the safety of the Class Vehicles;

    (f)    Defendant knew the omitted facts regarding the Mounting Bolt Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

    (g)    Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

    (h)    Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

192.    The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay less for them. Whether a vehicle's rear subframe is defective, causing the rear axle bolt to fracture, resulting in severe noise and vibration, sudden drop of the rear differential, sudden loss of power, and/or destruction of a broad array of suspension, driveshaft assembly, and exhaust system components, is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

193.    Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs and Class Members' purchase or lease of Defendant's defective Class Vehicles.

194.    Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

195.    As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the Class Vehicles and obtain restitution or (b) affirm their purchase or lease of the Class Vehicles and recover damages.

196.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and Class Members' rights and well-being to enrich Defendant.

## COUNT VII

### (For Unjust Enrichment)

197.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 110 above as if fully set forth herein.

198.    Plaintiffs bring this cause of action on behalf of themselves and the Class in the alternative to their Breach of Express Warranty claim, Count I.

199.    Defendant has received and retained a benefit from Plaintiffs and the members of the Class, and inequity has resulted.

COMPLAINT - CLASS ACTION - 42

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 • FAX 206.682.2992

200.    As a direct and proximate result of Defendant's failure to disclose known defects, Defendant has profited through the sale and lease of the Class Vehicles, the value of which were artificially inflated by Defendant's concealment of and omissions regarding the Mounting Bolt Defect. Defendant charged higher prices for the Class Vehicles than the Class Vehicles' true value, and Plaintiffs and Class Members thus overpaid for the Class Vehicles. Although these vehicles are purchased through Defendant's authorized dealers and distributors, the money from the vehicle sales flows directly back to Defendant.

201.    Additionally, as a direct and proximate result of Defendant's failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendant.

202.    Defendant has been unjustly enriched due to the known defects in the Class Vehicles through the use of money paid that earned interest or otherwise added to Defendant's profits when said money should have remained with Plaintiffs and Class Members.

203.    Plaintiffs and Class Members were not aware of the true facts regarding the Defect in the Class Vehicles and did not benefit from Defendant's unjust conduct.

204.    As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

205.    Plaintiffs do not seek restitution under their unjust enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

206.    Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class Members with replacement components that

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
TEL. 206.682.5600 ● FAX 206.682.2992

do not contain the defects alleged herein; and/or compelling Defendant to reform its warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## PRAYER FOR RELIEF

207.    Plaintiffs, on behalf of themselves and all others similarly situated, request the Court enter judgment against Defendant, as follows:

A.  An order certifying the proposed Class, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

B.  A declaration that Defendant is financially responsible for notifying all Class Members about the defective nature of the rear subframe;

C.  An order enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendant to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendant to repair and eliminate the Mounting Bolt Defect from every Class Vehicle; enjoining Defendant from selling the Class Vehicles with the misleading information; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

D.  An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

E.  Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

F.  Any and all remedies provided pursuant to the causes of action and statutes alleged herein;

COMPLAINT - CLASS ACTION - 44

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 ● FAX 206.682.2992

G.  A declaration that Defendant must disgorge, for the benefit of the Class, all or part of

the ill-gotten profits it received from the sale or lease of the Class Vehicles or make

full restitution to Plaintiffs and Class Members;

H.  An award of attorneys' fees and costs, as allowed by law;

I.   An award of pre-judgment and post-judgment interest, as provided by law;

J.   Leave to amend the Complaint to conform to the evidence produced at trial; and

K.  Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues in this action so triable.


DATED this 28th day of August, 2023.

TOUSLEY BRAIN STEPHENS PLLC


By: _s/ Jason T. Dennett_
    Jason T. Dennett, WSBA #30686
    jdennett@tousley.com
    _s/Kaleigh N. Boyd_
    Kaleigh N. Boyd, WSBA #52684
    kboyd@tousley.com
    1200 5th Avenue, Suite 1700
    Seattle, WA 98101
    206.682.5600
    206.682.2992

    Jonathan D. Selbin *
    Jason L. Lichtman *
    Muriel Kenfield-Kelleher *
    LIEFF CABRASER HEIMANN
    & BERNSTEIN, LLP
    250 Hudson Street, 8th Floor
    New York, NY 10013-1413
    212.355.9500
    jselbin@lchb.com
    jlichtman@lchb.com
    mkenfieldkelleher@lchb.com

TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington  98101
TEL. 206.682.5600 • FAX 206.682.2992

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Andrew R. Kaufman *
LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP
222 2nd Avenue South, Suite 1640
Nashville, Tennessee 37201
615.313.9000
akaufman@lchb.com

Russell D. Paul *
Abigail J. Gertner *
Amey J. Park *
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
215.875.3000
rpaul@bm.net
agertner@bm.net
apark@bm.net

Ketan A. Patel *
CORPUS LAW PATEL, LLC
P.O. Box 724713
Atlanta, Georgia 31139
678.597.8020
kp@corpus-law.com

* pro hac vice forthcoming
Attorneys for Plaintiffs and the Proposed Classes

COMPLAINT - CLASS ACTION - 46